IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CYNTHIA ORR and PATRICIA PAIZ,

      Plaintiffs,

vs.                                        Civ. No. 01-1365 JP/RHS

CITY OF ALBUQUERQUE and
MARY BETH VIGIL,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

On August 2, 2005, the Tenth Circuit reversed that part of the Court's October 17, 2003 Memorandum Opinion and Order (Doc. No. 130) which granted Defendants' Motion for Summary Judgment (Doc. No. 39) on the Title VII and New Mexico Human Rights Act (NMHRA) claims brought by Plaintiff Patricia Paiz and by Plaintiff Cynthia Orr with respect to her first pregnancy only.[1]  *Orr*, 417 F.3d at 1148-115.  The Tenth Circuit held that Plaintiffs Patricia Paiz and Cynthia Orr (Plaintiffs) presented sufficient evidence of a *prima facie* case of gender/pregnancy discrimination and that "Defendants appear to have presented a strong case for a justifiable business reason for their apparent disparate treatment-that had they known of the male employees' conduct in time to do so, they would have treated them the same as the female Plaintiffs." *Id*. at 1152.  The Tenth Circuit then stated that "[o]n remand, the district court must give the female Plaintiffs an opportunity to present a pretext case if they have any additional evidence to present on this point." *Id.*

---

[1]The Tenth Circuit affirmed the Court's grant of summary judgment in favor of Defendants with respect to Plaintiff Cynthia Orr's second pregnancy.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1151 (10th Cir. 2005).

In response to the Tenth Circuit's opinion, the Court asked counsel to present any additional evidence they may have on the issue of pretext.  Letter dated Aug. 5, 2005.  The parties subsequently conducted further discovery on the issue of pretext and filed the following pleadings: 1) Defendant City of Albuquerque's Memorandum in Support of Supplemental Motion for Summary Judgment (Doc. No. 151), filed February 15, 2006; and 2) Plaintiffs' Brief Presenting Additional Evidence of Pretext (Doc. No.152), filed February 15, 2006.  These two pleadings are now completely briefed.[2]  Having reviewed the briefs and relevant law on the issue of pretext, the Court finds that Defendants' Motion for Summary Judgment should be granted in that Plaintiff Cynthia Orr's Title VII and NMHRA claims with respect to the birth of her first child and Plaintiff Paiz's Title VII and NMHRA claims should be dismissed with prejudice.

A.  Summary of the Evidence

1.  Defendant City of Albuquerque's (City) Policies and Union Agreements

The City's  Administrative Instruction No. 7-13 (dated Sept. 1, 1992) was in effect during the times relevant to this lawsuit.  Administrative Instruction No. 7-13 provided that under the

_____

[2]Defendants note that Plaintiffs failed to comply with D.N.M. LR-Cv 56.1(b) in responding to Defendants' Memorandum in Support of Supplemental Motion for Summary Judgment.  D.N.M. LR-Cv 56.1(b) requires that "[a] memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted."  Accordingly, Defendants request that the statement of material facts set forth in their Memorandum in Support of Supplemental Motion for Summary Judgment be deemed admitted.  Considering the interests of justice and the additional briefing and presentation of facts associated with Plaintiffs' Brief Presenting Additional Evidence of Pretext, the Court declines to accept Defendants' request to deem admitted their statement of material facts found in the Memorandum in Support of Supplemental Motion for Summary Judgment.  The Court, however, admonishes Plaintiffs' counsel to become familiar with the local rules and to adhere to them in the future.

Family Medical Leave Act (FMLA) employees could receive both paid and unpaid parental leave during the first 12 weeks after the birth of a child.[3]  Administrative Instruction No. 7-13 at II.B.1, Ex. F (attached to Exhibits "1" Through "24").  Under Administrative Instruction No. 7-13, paid leave was to be used first during the 12 week period.  *Id*. at II. C.2. and 3.  Paid leave included accrued sick leave.  *Id*. at II.C.2.a.  Administrative Instruction No. 7-13 did not mention compensatory time as "paid leave" for FMLA purposes.  If there were insufficient paid leave available to cover the 12 week period, then the employee could use unpaid leave for the balance of that 12 week period or for the entire period, if necessary.  *Id*. at II.C.3.  Administrative Instruction No. 7-13, also, stated that an employee "may use accrued vacation as all or part of the 12-workweek FMLA entitlement."  *Id*. at II.D.   Additionally, an employee could request a "reduced leave schedule" for the birth of a child.  *Id*. at I.F.

On May 11, 2000, after the birth of Plaintiff Orr's first child and after the birth of Plaintiff Paiz's child, the City issued draft personnel rules and regulations including FMLA rules and regulations.  The draft personnel rules and regulations still provided for a 12 week period of leave for FMLA purposes, such as the birth of a child.  Under the draft personnel rules and regulations, employees were required to provide their department director or designee with enough information on the request for leave form to enable the department director or designee to determine if the requested leave qualified as FMLA leave.  Ex. F at Page 400-19 (attached to Exhibits "1" Through "24").  Leave could be designated as FMLA leave even if the employee was

---

[3]If both parents were employed by the City, the parents could take only a combined total of 12 weeks of leave for the birth of a child.  Administrative Instruction No. 7-13 at II.B.1, Ex. F (attached to Exhibits "1" Through "24" to Plaintiff's [sic] Brief Presenting Additional Evidence of Pretext (Doc. No. 153), filed Feb. 16, 2006)).

not requesting FMLA leave.  *Id*. at Page 400-20.  The department director or the City could also designate leave as FMLA qualifying leave even if the leave had already been taken.  *Id*.  The draft personnel rules and regulations also clarified that "[e]mployees must use accrued sick leave.  After accrued sick leave is exhausted, the employee may use vacation or unpaid leave."  *Id*.  As with Administrative Instruction No. 7-13, the draft personnel rules and regulations did not mention the use of compensatory time in taking FMLA leave.  The draft personnel rules and regulations became effective February 1, 2001, well after the Plaintiffs took their parental leaves.  Ex. 2 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment (Doc. No. 158), filed March 31, 2006).

In addition, the Albuquerque Police Officer's Association (APOA) agreements, effective from February 12, 1999 through February 11, 2000 and effective from May 6, 2000 through June 1, 2001, both stated that parental "leave may be granted in the following manner:  (1) up to 360 hours of Leave Without Pay in lieu of sick leave for a medical condition related to childbirth; and, (2) up to 360 hours of Leave Without Pay for care of a newborn child."  Section 5, Exs. 19 and 20 (attached to Exhibits "1" Through "24").  These APOA agreements, likewise, did not mention the use of compensatory time in taking FMLA leave.  Then, effective June 1, 2001, the APOA agreement was modified to specifically allow officers to use compensatory time in connection with FMLA qualifying leave.

Joyce Rodarte, the City's Human Resources Administrator during the times relevant to this lawsuit, interpreted the City FMLA policy, prior to June 1, 2001, to require that sick leave be exhausted before an employee could take vacation or leave without pay under the FMLA.  Depo. of Joyce Rodarte at 14, Ex. B (attached to Affidavit of Mary Beth Vigil)(attached to Defendant's

Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext (Doc. No. 158), filed March 31, 2006). Ms. Rodarte believed that "[n]o rule, policy or instruction permitted the use of compensatory time for FMLA qualifying absences."[4] Affidavit of Joyce Rodarte at ¶6 (attached to March 30, 2006 Affidavit of Mary Beth Vigil)(attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext). In addition, Ms. Rodarte observed that "[i]f it came to the attention of the city Human Resources Department that an employee had taken compensatory time for FMLA qualifying purposes, I instructed that the leave be changed in accordance with the city's policy." *Id*. at ¶12.

According to Defendant Vigil, Judy Kelley (a deputy city attorney) and Ms. Rodarte both instructed her to "prohibit the use of compensatory paid leave being used for FMLA qualifying purposes." Affidavit of Mary Beth Vigil (Feb. 14, 2006) at ¶¶7 and 8, Ex. A (attached to Defendant City of Albuquerque's Memorandum in Support of Supplemental Motion for Summary Judgment (Doc. No. 151), filed Feb. 15, 2006). Defendant Vigil also stated that she "applied this policy whenever [she] became aware that an employee was on FMLA leave, regardless of the basis for the FMLA leave." *Id*. at ¶9. Defendant Vigil further stated that the City's legal department instructed her to use the draft personnel rules and regulations. Depo. of Mary Beth Vigil at 15, 17, Ex. 3 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment). Ms. Rodarate, however, would not have instructed Defendant Vigil to apply the draft personnel rules and regulations. Depo. of

---

[4]Although the City's Human Resources Department instructed Stephanie Sanchez, one of Defendant Vigil's employees, that Administrative Instruction No. 7-13 required the use of sick leave and vacation, according to Ms. Sanchez the City's Human Resources Department did not address the use of compensatory time. Depo. of Stephanie Sanchez at 9, Ex. C. (attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext).

Joyce A. Rodarte at 8 and 24, Ex. 5 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment).

    2.  The Plaintiffs

    Plaintiff Orr originally planned to take six months of paid leave from work following the birth of her first child.  Her first child was born on April 29, 2000.  When Plaintiff Orr found out she was pregnant with her first child she went to the personnel office and asked personnel employees what she had to do to take parental leave.  No one at the personnel office gave her any paperwork or policies with respect to parental leave.  After Plaintiff Orr discussed her plan for parental leave with Lieutenant Nogales, who was Plaintiff Orr's supervisor at the District Attorney's Liaison Office, Lieutenant Nogales suggested that Plaintiff Orr work part-time from her home after the baby was born.  Consequently, Plaintiff Orr requested to use over 300 hours of compensatory time[5], take vacation[6], take sick leave[7], and work part-time for her parental leave.  Plaintiff Orr did not request FMLA leave.[8]  Plaintiff Orr, in fact, took approximately three weeks of compensatory time after her baby was born and then began to work part-time.

---

    [5]Plaintiff Orr exceeded the Albuquerque Police Department's (APD) 150 hour cap on the accumulation of compensatory time with the approval of her immediate supervisors. Under APD rules, if an APD officer exceeds the compensatory time cap, that officer cannot accumulate additional compensatory time until the officer's compensatory time amounts to less than the cap.

    [6]Plaintiff Orr wanted to use her vacation time because there was a cap on how much vacation time she could accumulate.

    [7]The Plaintiffs did not want to use sick leave first, if at all, for parental leave because sick leave can be applied toward determining an earlier retirement date.  Moreover, there is no cap on the accumulation of sick leave.

    [8]The leave request form for compensatory time does not require an explanation or reason for the requested compensatory time.

Sometime in May 2000, one of Defendant Vigil's staff members informed Defendant Vigil that Plaintiff Orr had given birth to a child and was taking compensatory time to cover her parental leave.  Consequently, Defendant Vigil contacted Plaintiff Orr and informed her that under the draft personnel rules and regulations, Administrative Instruction No. 7-13, and the applicable APOA agreement provisions, Plaintiff Orr had to use sick leave for her parental leave, instead of using compensatory time and before using vacation time.[9]  Defendant Vigil ultimately changed Plaintiff Orr's leave record to reflect that sick leave was used for the parental leave.[10]

Moreover, according to Plaintiff Orr, Defendant Vigil told her that she could not work for 12 weeks because of her pregnancy.  Defendant Vigil denies that she told Plaintiff Orr that she had to take 12 weeks of parental leave.  Plaintiff Orr also contends that Defendant Vigil told her that she could not work part-time because she had been pregnant.  Defendant Vigil, on the other hand, explains that she did not approve the return to part-time work because Plaintiff Orr had not obtained a release to return to work.  Accordingly, the personnel office did not recognize the fact that Plaintiff Orr had worked part-time for some of her parental leave.[11]  Plaintiff Orr finally took 13 weeks of parental leave from April 29, 2000 to July 28, 2000.  In November 2000, Plaintiff Orr filed an Equal Employment Opportunity Commission (EEOC) complaint with respect to the

---

[9]Ms. Kelley would not have instructed Defendant Vigil to prohibit the use of vacation time for FMLA leave.  Depo. of Judy Kelley at 15, Ex.21 (attached to Exhibits "1" Through "24").

[10]Plaintiff Orr asserts that her time slips were altered without her permission to reflect the sick leave.

[11]On June 11, 2000, Plaintiff Orr wrote a memo to APD Chief Gerald Galvin requesting six months of FMLA leave.  Plaintiff Orr contends that Defendant Vigil told her to write that memo if she wanted to get paid for her part-time work (20 hours). Apparently, Plaintiff Orr was never paid for that part-time work.

parental leave issues.

With regard to Plaintiff Paiz and the birth of her child on July 28, 2000, Plaintiff Paiz planned to use 515 hours of compensatory time[12] in conjunction with part-time work for her parental leave.  Plaintiff Paiz chose to not to use FMLA leave for her parental leave.  Plaintiff Paiz's immediate supervisors approved her request to use compensatory time and work part-time for parental leave.

Sometime during August 2000, one of Defendant Vigil's staff members informed Defendant Vigil that Plaintiff Paiz had given birth to a child and was taking compensatory time to cover her parental leave.  Defendant Vigil, therefore, contacted Plaintiff Paiz and informed her that under the draft personnel rules and regulations, Administrative Instruction No. 7-13, and the applicable APOA agreement provisions she had to use sick leave for her parental leave instead of compensatory time.  Although Plaintiff Paiz eventually returned to full-time work after approximately ten weeks of parental leave, she claims that Defendant Vigil previously told her she had to take 12 weeks of parental leave because of her pregnancy.  Defendant Vigil denies that she told Plaintiff Paiz that she had to take 12 weeks of parental leave.

Plaintiff Paiz subsequently requested a meeting with Deputy Chief Ruben Davalos and Defendant Vigil regarding the changes made to her time slips to reflect use of sick leave for her parental leave.  Sometime after November 23, 2000, a meeting was held among Deputy Chief Davalos, Defendant Vigil, Mary Molina-Mescall, and Plaintiff Paiz.  At the meeting, Deputy Chief

---

[12]Plaintiff Paiz exceeded the APD 150 hour cap on the accumulation of compensatory time with the approval of her immediate supervisors.  Sometime during Plaintiff Paiz's parental leave, the Defendant City began to order employees to take compensatory time if they had more than 250 hours of compensatory time.  Apparently, city employees including APD officers other than the Plaintiffs had also exceeded the compensatory time cap.

Davalos stated that he believed an officer could use compensatory time, vacation time, or sick leave under the FMLA. Deputy Chief Davalos noted that he had taken compensatory time for kidney problems in 1999.[13]  Upon learning at the meeting that Deputy Chief Davalos had used compensatory time instead of sick leave for FMLA purposes, Defendant Vigil attempted to change Deputy Chief Davalos' leave record to show the use of sick leave in lieu of compensatory time.[14]  Defendant Vigil was, however, unable to change the leave record because she could not pinpoint what days of compensatory time Deputy Chief Davalos used for FMLA qualifying absences.  Moreover, Defendant Vigil did not continue to pursue the identification of Deputy Chief Davalos' compensatory time taken for FMLA qualifying absences once she received a letter from the United States Department of Labor, Wage and Hour Division (Wage and Hour) prohibiting her from changing the parental leaves of Officers Stephen Orr (Plaintiff Orr's husband) and Richard Dilley to reflect sick leave because of the significant passage of time since they had taken parental leave.  *See infra*.  Deputy Chief Davalos has since been required to take sick leave before using any other leave for FMLA qualifying absences, and in fact, he took over a month of sick leave under the FMLA in March and April 2001.  *See* Ex. A-1 (attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext).

_____

[13]Defendant Vigil claims that she was not previously aware of Deputy Chief Davalos' kidney problems.  On the other hand, Deputy Chief Davalos claims that Defendant Vigil should have been aware of his illness because of his absence from meetings which both he and Defendant Vigil regularly attended several times a week.

[14]Deputy Chief Davalos claims that "[a]t no time during my employment with APD was my use of compensatory time for treatment and hospitalization for this illness ever questioned by anyone."  Affidavit of Ruben Davalos at ¶5, Ex. 18 (Plaintiffs' Response to Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment (Doc. No. 160), filed March 31, 2006).  This statement does not rule out that Defendant Vigil was investigating Deputy Chief Davalos' leave without his knowledge.

9

After the meeting with Deputy Chief Davalos, Ms. Molina-Mescall, and Defendant Vigil, Plaintiff Paiz was under the impression that she could use her compensatory time for her parental leave and then work part-time.  Plaintiff Paiz began to submit time slips showing compensatory time and part-time work. However, according to Defendant Vigil some weeks later she  followed Ms. Kelley's directive and changed Plaintiff Paiz's leave records to reflect use of sick leave.[15] Defendant Vigil also refused to compensate Plaintiff Paiz for part-time work because Plaintiff Paiz had not obtained a release to work part-time. Plaintiff Paiz eventually filed an EEOC complaint based on the parental leave problems she experienced.

In January 2001, the Plaintiffs unsuccessfully engaged in an EEOC mediation. At the EEOC mediation, the Plaintiffs identified Officers Stephen Orr and Richard Dilley as witnesses in the EEOC proceeding.  Plaintiff Orr indicated at the mediation that Officer Stephen Orr's supervisors allowed him to use two weeks of compensatory time for his parental leave when Plaintiff Orr gave birth to their child in April 2000 and that Officer Richard Dilley was allowed to use compensatory time for his parental leave.

The day after the EEOC mediation was held, Defendant Vigil contacted Officers Stephen Orr and Richard Dilley to inform them that she would be changing their leave records to reflect the use of sick leave instead of compensatory time for their parental leave.  Defendant Vigil contends that if she had known that Officers Stephen Orr and Richard Dilley had asked to use compensatory time in connection with their parental leave, she would have denied their requests and would have insisted on the use of sick leave at that time.  The Wage and Hour Division

_____

[15]Plaintiff Paiz asserts that her time slips were actually forged and altered to reflect the sick leave.

subsequently informed Defendant Vigil that she could not make the changes to the leave records

of Officers Stephen Orr and Richard Dilley because of the significant length of time that had

passed since they took parental leave.  Defendant Vigil, therefore, ultimately had their leave

records reflect the use of compensatory time for the parental leave.

After the APOA agreement was modified in June 2001 to allow the use of compensatory

time in connection with FMLA leave, Defendant Vigil notified the Plaintiffs that she could now

change their leave records to reflect the use of compensatory time for their parental leave.  While

Plaintiff Paiz accepted Defendant Vigil's offer to have her leave records changed to reflect the use

of compensatory time for her parental leave, Plaintiff Orr did not.

3.  Previous Complaints Regarding Female Officers and Parental Leave

In 1992, Marie Saenz, a former APD police officer, filed a successful federal pregnancy

discrimination lawsuit against the City, Sergeant Mark Wilson, and Lieutenant P. Dunworth.  Civ.

No. 92-347 M (D.N.M.), *aff'd*, 54 F.3d 788 (10th Cir. 1995).  Ms. Saenz did not name

Defendant Vigil as a defendant in that lawsuit.  Ms. Saenz alleged in her complaint that the City

discriminated against her based on her pregnancy "by 1) placing plaintiff on light duty status at the

onset of her pregnancy; 2) refusing plaintiff a transfer to civil litigation because of her pregnancy;

3) refusing to place her in a light duty position in January, 1991 [(prior to giving birth)]; 4)

forcing her to take sick leave in January and February 1991 [(prior to giving birth)]; and 5)

transferring her to White Collar Crimes Unit during her Maternity leave."  First Amended

11

Complaint for Civil Rights at ¶18 (Doc. No. 2).  Ms. Saenz also alleged that

> 19.  Sergeant Wilson discriminated against plaintiff because of her pregnancy by failing to upgrade plaintiff to acting sergeant when it was plaintiff's turn in the rotation and by counselling [sic] plaintiff in retaliation for her complaint that she was being treated unfairly because of her pregnancy.  Sergeant Wilson also engaged in a series of acts intended to harass and intimidate plaintiff because of her pregnancy, sex and because of her complaint of discrimination.  Lieutenant Dunworth discriminated against plaintiff because of pregnancy and sex by participating in and approving the counselling [sic] of plaintiff and by participating, approving, and failing to stop the discriminatory harassment Sergeant Wilson inflicted upon plaintiff.

*Id*. at ¶19.  Defendant Vigil testified at the bench trial before the Honorable Senior United States District Judge Edwin Mechem that Ms. Saenz submitted a request to transfer to the Civil Litigation Unit during her pregnancy.  Transcript of Proceedings at 176-81, dated May 26, 1993, filed June 7, 1993. Defendant Vigil also testified that Ms. Saenz was placed on sick leave for eleven days at the end of January 1991.  *Id*. at 182.  Judge Mechem found that the transfer request was submitted up the chain of command to Deputy Chief Nick Alarid and then that the request for transfer initially was denied due to Ms. Saenz's limited or light duty status.  Findings of Fact and Conclusions of Law at ¶¶16-18 (Doc. No. 53), filed Aug. 6, 1993.  Defendant Vigil was not involved in determining whether to place Ms. Saenz on light duty nor was Defendant Vigil involved in denying Ms. Saenz's request to transfer to the Civil Litigation Unit.  *See id*. at ¶12 (the Claims Validation Unit of APD placed Ms. Saenz on light or limited duty status).  Moreover, Deputy Chief James Emsing, not Defendant Vigil, placed Ms. Saenz on involuntary sick leave.  *Id*. at ¶41.  The question of use of compensatory time for parental leave was not an issue in Ms. Saenz' case nor was the question of part-time work during parental leave an issue.

In a letter dated February 26, 1997, Sharon Walton, a legal advisor for APD, requested the paymaster, who had been in contact with Defendant Vigil, to review leave for child birth taken

by several female officers including Ms. Saenz.[16]  Apparently, these female officers had been required to take sick leave or unpaid leave for parental leave while male officers who were ill or injured could take a combination of compensatory time, vacation, and sick leave. [17]  These female officers complained that being forced to use sick leave for maternity leave unfairly affected their ability to retire early when compared to the male officers who could forestall the use of sick leave and thereby retire earlier than the female officers.  In a memo dated December 5, 2002, the City corrected the retirement dates for the female officers who had not already retired or who showed an "interruption in time".[18]

B.  Summary Judgment Standard

    Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

---

[16]This letter states that one of the officers requesting a review of parental leave was Officer Michael Martinez.  The Court assumes that Officer Martinez is female based on a December 5, 2002 memo referring to the "maternal" leave of those officers.

[17]This information comes from an Affidavit of Dita Dow, an APD detective, who was one of the female officers who requested review of her parental leave.  *See* Ex. 24 (attached to Exhibits "1" Through "24"). The affidavit also contains a vague reference to a "judgment" entered against APD around 1991.  The Court will accord no weight to that reference because of its vagueness.

[18]This memo contradicts Det. Dow's affidavit at ¶8 which states that "[d]espite the agreement, APD had yet to comply with the agreement for all officers who were affected."

U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

C.  Discussion

    1.  Whether Defendant Vigil is Still a Defendant Following the Remand from the Tenth Circuit

    Defendant Vigil argues initially that she is no longer a defendant because the Tenth Circuit concluded its opinion by stating that "[w]e affirm the district court's grant of Defendants' motion for summary judgment except as to the female Plaintiffs' Title VII claim." 417 F.3d at 1155 (footnote excluded). Defendant Vigil notes correctly that Title VII claims are not cognizable against individual supervisors. *See, e.g., Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993). However, the Tenth Circuit stated earlier in a footnote that "[b]ecause the female Plaintiffs' burden under the NMHRA is identical to their burden under Title VII, our analysis of the federal law applies equally to their state-law claims." *Orr*, 417 F.3d at 1149 n.5. The Tenth Circuit also stated that "[s]ummary judgment as to the female Plaintiffs' Title VII and NMHRA claims was therefore inappropriate." *Id*. at 1152. From this language, the Court concludes that the Tenth Circuit remanded both the NMHRA claims and the Title VII claims to this Court for consideration of the pretext issue. The New Mexico State Supreme Court has recognized that

14

individual defendants can be liable under the NMHRA.  *See Kelley v. City of Albuquerque*, 375

F.Supp.2d 1183, 1213 (D.N.M. 2004); *Sonntag v. Shaw*, 2001-NMSC-015 ¶¶12, 13, 130 N.M.

238, 243.  Because the NMHRA claims are still viable (although basically subsumed in the Title

VII claims), Defendant Vigil remains a defendant with respect to the NMHRA claims now before

this Court.

     2.  Pretext

     To withstand summary judgment on a pretext issue, the plaintiff must present "evidence

sufficient to raise a genuine dispute of material fact whether Defendants' articulated reason for the

adverse employment action is pretextual."  *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220

F.3d 1184, 1197 (10th Cir. 2000).  In the Tenth Circuit, "[a] plaintiff demonstrates pretext by

producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did

not act for the asserted non-discriminatory reasons.'"  *Jaramillo v. Colorado Judicial Dept.*, 427

F.3d 1303, 1308 (10th Cir. 2005)(quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.

1997)).  "Evidence of pretext may include 'prior treatment of plaintiff; the employer's policy and

practice regarding minority employment (including statistical data); disturbing procedural

irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria.'"  *Id*.

(quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)).  Pretext can

also be shown by the  "differential treatment of similarly-situated employees," although

"[u]nexplained or irrational differences in Defendant's treatment of pregnant and non-pregnant

employees do not establish discrimination as a matter of law" nor do trivial or accidental

differences in treatment.  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1199; *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).  Changing or shifting rationales for making an adverse employment action is also evidence of pretext; however, employers should not be penalized for changing employment practices over time to better address business needs. *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002); *Kendrick*, 220 F.3d at 1234.  Moreover, "in evaluating pretext, the 'relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.'"  *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004)(quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).  In addition, a plaintiff's "'mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'"  *Mitchell v. City of Wichita, Kansas*, 140 Fed. Appx. 767, 777 (10th Cir. 2005)(quoting *Branson v. Price River Coal Co*, 853 F.2d 768, 771-72 (10th Cir. 1988)(internal citations and quotations omitted)). In reviewing pretext issues, it is important to keep in mind that the courts should not "'act as a super personnel department that second guesses employers' business judgments.'"  *Jaramillo*, 427 F.3d at 1308 (quoting *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)(quotation omitted)).

        Plaintiffs argue first that Defendant Vigil's failure to follow an established policy when she changed Plaintiffs' compensatory time to sick leave is evidence of pretext.  Plaintiffs argue that Defendant Vigil should not have been applying the draft personnel rules and regulations because they would not become effective until February 1, 2001, well after the Plaintiffs had taken their

parental leaves.  Plaintiffs contend that the relevant FMLA leave policy was contained in

Administrative Instruction No. 7-13 which did not require employees to apply for FMLA leave if

they were going to take an FMLA qualifying absence, did not require explicitly that employees

take sick leave first for FMLA leave, and permitted employees to take vacation, intermittent

leave, and reduced leave schedules for FMLA qualifying absences.  Plaintiffs further contend that

Administrative Instruction No. 7-13 and the relevant APOA agreements did not explicitly prohibit

the use of compensatory time for FMLA qualifying absences.  In addition, Plaintiffs note that the

relevant APOA agreements did not require a request for parental leave under the FMLA or that

sick leave be used first under the FMLA.  Because the relevant APOA agreements are completely

silent on the issues critical to this lawsuit, they are of limited use in determining the City's FMLA

policies:  silence on a policy could just as likely mean that the policy is either implicitly permitted

or not permitted by the fact of omission.  Consequently, the Court will focus on the interpretation

and applicability of Administrative Instruction No. 7-13 and the draft personnel rules and

regulations.[19]  Second, Plaintiffs argue that the Defendants' interpretation of the City FMLA

policy violated several specific federal regulations, thereby providing evidence of pretext.  Third,

Plaintiffs argue that Defendant Vigil's failure to implement the City's FMLA policy in a neutral,

nondiscriminatory manner as she claims she did is evidence of pretext. Finally, Plaintiffs argue that

Defendant Vigil's alleged statements to Plaintiffs that they had to take 12 weeks of parental leave

due to their pregnancies is direct evidence of pretext.

---

[19]Although Administrative Instruction No. 7-13 and the draft personnel rules and
regulations are also silent on the use of compensatory time, those documents have more substance
from which to ascertain the possible meaning of that silence than is found in the APOA
agreements and there is evidence on how those documents have been used and interpreted by City
personnel.

a.  Defendant Vigil's Use of Administrative Instruction No. 7-13 and the Draft Personnel Rules and Regulations

Defendant Vigil understood from Ms. Kelley that she was to apply the draft personnel rules and regulations to FMLA situations.  Depo. of Mary Beth Vigil at 15-19, Ex. 3 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment).   Defendant Vigil, however, erred in applying the draft personnel rules and regulations because they had not yet been finalized.  Depo. of Joyce A. Rodarte at 8-9 Ex. 5 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment).  Nonetheless, that error is harmless with respect to the prohibition of the use of compensatory time for FLMA leave.  It is not disputed that Defendant Vigil, Ms. Kelley, and Ms. Rodarte all understood that it was the "policy" under Administrative Instruction No. 7-13 to prohibit use of compensatory time for FMLA leave.  Nothing in the record suggests that this "policy" changed under the draft personnel rules and regulations.  In fact, Defendant Vigil and Ms. Kelley believed that the draft personnel rules and regulations generally clarified Administrative Instruction No. 7-13 without changing the substance of Administrative Instruction No. 7-13.  Depo. of Judy Kelley at 17, Ex. 4 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment); Interoffice Memorandum to Patricia Paiz dated Nov. 23, 2000, Ex. 10 (attached to Exhibits "1" Through 24"); Interoffice Memorandum to Cynthia Orr, dated Nov. 23, 2000 Ex. F (attached to Depo. of Cynthia Orr, Ex. 2 (attached to Exhibits "1" Through 24")).

With respect to the use of sick leave first, Defendant Vigil, Ms. Sanchez, and Ms. Rodarte interpreted Administrative Instruction No. 7-13 to require that an employee use sick leave first

before taking vacation or unpaid leave.  The draft personnel rules and regulations explicitly stated that "[e]mployees must use accrued sick leave.  After accrued sick leave is exhausted, the employee may use vacation or unpaid leave."  May 11, 2000 Draft Personnel Rules and Regulations at page 400-21 (attached to Ex. F (attached to Depo. of Cynthia Orr, Ex. 2)(attached to Exhibits "1" Through "24")).  The draft personnel rules and regulations simply reflected the accepted "policy" under Administrative Instruction No. 7-13 to use sick leave first.  Whether Defendant Vigil was applying Administrative Instruction No. 7-13 or the draft personnel rules and regulations, the resulting FMLA policy was the same:  compensatory time was prohibited and sick leave had to be used first.  A reasonable juror, therefore, could not find that Defendant Vigil's erroneous use of the draft personnel rules and regulations to exclude compensatory time and use sick leave first was evidence of pretext when the "policy" established under Administrative Instruction No. 7-13 also excluded the use of compensatory time for FMLA leave and required that sick leave be applied first.

There is, however, a fundamental difference between the draft personnel rules and regulations and Administrative Instruction No. 7-13 with regard to requesting FMLA leave. Apparently Administrative Instruction No. 7-13 allows an eligible employee to request FMLA leave if the employee desires to do so, but it does not require an employee who is going to take an FMLA qualifying absence to request FMLA leave.  Administrative Instruction No. 7-13  at II.C., Ex. 1 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment).  In other words, an employee who would otherwise qualify for FMLA leave could choose not to request FMLA leave and instead could use any appropriate leave including compensatory time.  Under the draft personnel rules and

19

regulations, the department director or designee determines if the leave request is an FMLA qualifying absence whether or not the employee requested FMLA leave.  Consequently, an employee with an FMLA qualifying absence cannot avoid FMLA leave in order to use sick leave, vacation or compensatory time in any way the employee chooses.

In this case, Plaintiffs decided not to apply for FMLA leave but to use compensatory time for FMLA purposes.  This would have been permissible under Administrative Instruction No. 7-13 but not under the draft personnel rules and regulations.  In this context, Defendant Vigil's decision to apply the draft personnel rules and regulations to Plaintiffs resulted in their inability to take compensatory time whereas they could have used compensatory time had Defendant Vigil exclusively applied Administrative Instruction No. 7-13.

Defendant Vigil says that she did not apply the draft personnel rules and regulations on her own initiative.  Defendant Vigil states that the City legal department instructed her to apply the draft personnel rules and regulations, presumably to all APD personnel.  Plaintiffs contend that this instruction was contrary to Ms. Rodarte's statement that she would not have advised Defendant Vigil to apply the draft personnel rules and regulations.  Plaintiffs also contend that Defendant Vigil's statement that the City legal department instructed her to apply the draft personnel rules and regulations conflicts not only with Ms. Rodarte's statement but with statements by Ms. Kelley.  Plaintiffs argue that these inconsistencies constitute further evidence of pretext.

Ms. Rodarte, however, did not state that she actually told Defendant Vigil not to use the draft personnel rules and regulations; Ms. Rodarte simply testified in a hypothetical manner that she would not have told Ms. Vigil to apply the draft personnel rules and regulations.  In addition,

Ms. Kelley only stated that her legal advice to Defendant Vigil "would have been that the use of

comp time was not allowed for FMLA reasons under the city's policy and that the use of

vacation time was at the option of the employee."  Depo. of Judy Kelley at 15, Ex. 4 (attached to

Plaintiffs' Brief Presenting Additional Evidence of Pretext).  This testimony does not indicate that

Ms. Kelley told Defendant Vigil not to use the draft personnel rules and regulations and it is

actually consistent with Defendant Vigil's understanding that compensatory time was not allowed

for FMLA leave.  Nevertheless, even if Defendant Vigil applied the draft personnel rules and

regulations on her own initiative without any authority to do so, the issue really is whether

Defendant Vigil applied the draft personnel rules and regulations to all APD personnel or only to

female officers seeking leave for the birth of a child. This is basically a disparate treatment issue

which will be discussed *infra*.

      The Plaintiffs also assert that Defendant Vigil denied Plaintiffs the opportunity to engage

in reduced or intermittent leave schedules by not allowing them to work part-time.  Both the draft

personnel rules and regulations and Administrative Instruction No. 7-13 allow employees to

request intermittent leave or reduced leave as alternatives to the use of sick leave or vacation.

Defendant Vigil does not deny that the Plaintiffs were permitted to request reduced leave

schedules.  Defendant Vigil instead contends that she denied the requests for reduced leave

schedules because Plaintiffs had not obtained medical releases to return to work.  Administrative

Instruction No. 7-13 at II. F.5. stated that "[t]he City shall require a fitness for duty report, based

on essential job functions, to return to work."  Ex. 1 (attached to Plaintiffs' Response and

Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment).  The

draft personnel rules and regulations provided that "[e]mployees returning to work from a serious

health condition must submit to the Human Resources Department a release from their personal physician."  Draft Personnel Rules and Regulations at Page 400-23 (attached to Ex. F)(attached to Exhibits "1" Through "24").  A "serious health condition" included incapacity due to pregnancy.  *Id*. at Page 400-26.  Since Defendant Vigil could under either Administrative Instruction No. 7-13 or the draft personnel rules and regulations require that Plaintiffs produce medical releases before allowing them to return to work, even part-time work, a reasonable juror could not find that Defendant Vigil's denial of the Plaintiffs' request for part-time work showed pretext.

### b.  FMLA Regulations

In addition, the Plaintiffs claim that the City's violation of  federal FMLA regulations is proof of pretext.  29 C.F.R. §825.207(i) states that "[t]he employee may request to use his/her balance of compensatory time for an FMLA reason."[20]   Defendants argue that §825.207(i) does not apply because the Plaintiffs did not request FMLA absences or ask to use compensatory time for FMLA absences.  Instead, Plaintiffs' supervisors simply approved the use of compensatory time and part-time work without alerting Defendant Vigil that the use of compensatory time and part-time work was for FMLA purposes.  However, once Defendant Vigil spoke with Plaintiffs about their parental leave, one could reasonably find that Plaintiffs, at that time, requested the use of compensatory time for FMLA qualifying absences, and that Plaintiffs should have been allowed to use compensatory time for those absences under §825.207(i).

---

[20]This provision was in effect during the relevant time.

Furthermore, 29 C.F.R. §825.207(e) states that

Paid vacation or personal leave, including leave earned or accrued under plans allowing "paid time off," may be substituted, at either the employee's or the employer's option, for any qualified FMLA leave.  No limitations may be placed by the employer on substitution of paid vacation or personal leave for [FMLA] purposes.

This provision implies that an employee can choose to use vacation time before sick leave when taking an FMLA qualifying absence.  Consequently, requiring Plaintiff Orr to use sick leave first would have been a violation of §825.207(e) since she also requested to use vacation for parental leave.  Although the Defendants arguably violated §825.207(e) and (i), there is no evidence that the Defendants violated those provisions in bad faith as opposed to violating those provisions because of ignorance or negligence.  *See Stover*, 382 F.3d at 1076 ("in evaluating pretext, the 'relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.'")(citation omitted).  Without that evidence, a reasonable jury could not find that the mere violation of those provisions shows pretext.  To the extent that Plaintiffs are arguing that Defendant Vigil or the City violated those regulations with respect to only female officers seeking parental leave, the Plaintiffs are once again making a disparate treatment argument.

### c.  Disparate Treatment

Next, Plaintiffs argue that pretext is demonstrated by the disparate treatment of female officers who were denied the use of compensatory time for parental leave.  Plaintiffs claim that female officers who wanted to use compensatory time for parental leave were treated differently because (1) male officers were allowed to use compensatory time for parental leave, and (2) male or female officers were permitted to use compensatory time for FMLA purposes other than

23

parental leave.  To support this disparate treatment argument, Plaintiffs have submitted numerous statements by officers regarding the taking of FMLA qualifying leave and the use of compensatory time. The Court, however, will examine only the statements by male Officers Scott Parsons, Timothy Harrington, Arthur Younger, Raymond Torres, and Leonard Mascareñas as presented in Exhibit 2 (attached to Plaintiffs' Supplemental Response and Surreply in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 105), filed Aug. 5, 2003).  These statements are admissible for summary judgment purposes under 28 U.S.C. §1746 (allowing use of unsworn declarations made under penalty of perjury)[21] whereas the other statements submitted by Plaintiffs do not meet the requirements of  §1746 and are, therefore, inadmissible for summary judgment purposes.[22]

With respect to Officer Parsons, Defendant Vigil told Officer Parsons he could not use compensatory time for leave following the birth of his child in March 2001.  Affidavit of Mary Beth Vigil at ¶16, Ex. A (attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext).  Although Officer Parsons requested use of vacation time, he was required to use FMLA sick leave first.  Ex. A-2 (attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext). Upon the birth of his second child in

---

[21]The Court will also examine the properly sworn statement of female Det. Dow, *infra,* in discussing past complaints of discrimination by female officers seeking parental leave.

[22]Plaintiff Orr mentions in her deposition Officer Scott Elliot who took compensatory time for the birth of a child and Lieutenant Michelle Campbell who took compensatory time for a hysterectomy.  *See* Depo. of Cynthia Orr at 94, 121-22, Ex. 2 (attached to Exhibits "1" Through "24").  Plaintiff Paiz further mentions in her deposition Officer Anthony Maes as an example of a male officer who used compensatory time for parental leave.  Depo. of Patricia Paiz at 99-100, Ex. 7 (attached to Exhibits "1" Through "24").  The Court will not consider these references in Plaintiffs' depositions because they constitute inadmissible hearsay.

2002, Officer Parsons used FMLA vacation leave as permitted by the June 2001 APOA agreement.  *Id.*

Defendant Vigil also told Officer Harrington that he could not use compensatory time for leave after the birth of a child in 1995.  Affidavit of Mary Beth Vigil at ¶17, Ex. A (attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext).  Officer Harrington's leave record does not show that he used compensatory time but rather that he first used sick leave time, then vacation time.[23]  Ex. A-3 (attached to Defendant's Response to Plaintiffs' Brief Presenting Additional Evidence of Pretext).

Officer Younger indicates in his statement that he did not fill out FMLA paperwork for leave related to the birth of his child in 1993 and that he took compensatory time and vacation leave to cover parental leave.  There is no evidence that Defendant Vigil knew that Officer Younger was taking compensatory time for parental leave purposes, especially since he did not fill out FMLA paperwork.[24]

Although Officer Torres declares in his statement that he took compensatory time and vacation leave for the birth of his child in 1986, he does not state whether he filled out FMLA paperwork.  There is no evidence that Defendant Vigil knew that Officer Torres was taking compensatory time for parental leave purposes.

---

[23]Officer Harrington's leave records contradict his assertion that he had to take all of his compensatory time and vacation time before he could use FMLA sick leave.  *See* Exhibit 2 (attached to Plaintiffs' Supplemental Response and Surreply in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 105)).

[24]It is undisputed that Defendant Vigil's responsibilities did not require her to personally scrutinize every employee's leave request unless there was an issue with the leave request.

Officer Mascareñas states he filled out FMLA paperwork for the birth of a child and took compensatory time and vacation time for parental leave.  However, Officer Mascareñas does not state when this occurred making it impossible to determine if his use of compensatory and vacation time was appropriate under the June 2001 APOA agreement.

In sum, the undisputed evidence regarding the parental leave taken by male Officers Parson, Harrington, Younger, Torres, and Mascareñas does not constitute evidence of disparate treatment.  Consequently, a reasonable juror could not find that the circumstances surrounding these male officers' parental leave is proof of pretext.

Plaintiffs also assert that with respect to Officers Stephen Orr and Richard Dilley, Defendant Vigil would not have tried to change their compensatory time to sick leave if she had been unaware that Officers Stephen Orr and Richard Dilley were willing to testify against her regarding the Plaintiffs' EEOC complaint.  Plaintiffs speculate that Defendant Vigil's real motivation for trying to change Officers Stephen Orr and Richard Dilley's compensatory time to sick leave was retaliatory in nature.  The Tenth Circuit refuted this contention when it affirmed this Court's conclusion that the undisputed evidence showed that Defendant Vigil did not retaliate against Officer Stephen Orr (and presumably, Officer Richard Dilley as well) by attempting to change his compensatory time to sick leave after she found out that Officer Stephen Orr was willing to testify against her.   417 F.3d at 155, 156 n.11.

Alternatively, Plaintiffs argue that Defendant Vigil knew that Officer Stephen Orr was taking compensatory time for parental leave before the EEOC mediation session because 1) Officer Stephen Orr took compensatory time at the same time Plaintiff Orr was taking parental leave; and 2) there are only two Orrs in the police department.  It is undisputed that Defendant

26

Vigil does not personally examine all leave requests; she has staff personnel who process the leave requests. The Plaintiffs have not presented any evidence that when Defendant Vigil was investigating the status of Plaintiff Orr's parental leave (only after a staff member alerted Defendant Vigil to the situation) Defendant Vigil knew that Officer Stephen Orr had chosen to take parental leave. Likewise, Plaintiffs have not come forward with any evidence that even if Defendant Vigil was aware that Officer Stephen Orr was taking parental leave she had any reason to investigate that leave. Furthermore, the Plaintiffs have not presented evidence that Defendant Vigil knew that the two persons in the police department named Orr were married. A reasonable juror, therefore, could not find that Defendant Vigil's failure to investigate Officer Stephen Orr's use of compensatory time when she became aware that Plaintiff Orr gave birth to her first child amounts to evidence of pretext.

Plaintiffs further argue that Defendant Vigil's failure to change Deputy Chief Davalos' compensatory time to sick leave for his FMLA qualifying absences constitutes evidence of disparate treatment. Defendant Vigil initially claimed that she could not change Deputy Chief Davalos' FMLA leave to sick leave because of the Wage and Hour letter sent to her regarding Officers Stephen Orr and Richard Dilley's parental leave. Depo. of Mary Beth Vigil at 20, Ex.3 (attached to Plaintiffs' Response and Memorandum in Opposition to Defendants' Supplemental Motion for Summary Judgment). Plaintiffs assert that Defendant Vigil could not have relied on the Wage and Hour letter with respect to Deputy Chief Davalos, because Defendant Vigil did not receive that letter until about seven months after she discovered that Deputy Chief Davalos used compensatory time instead of sick leave for FMLA purposes. Defendant Vigil admitted in her deposition that she was not sure about the dates. *Id*. Even if the Wage and Hour letter was sent

27

to Defendant Vigil seven months later, there is no evidence that reliance on that letter was

somehow unreasonable.

Defendant Vigil also explains that she could not determine specifically which of Deputy

Chief Davalos' leave dates qualified as FMLA leave.  Plaintiffs respond by asserting that

Defendant Vigil should have asked Deputy Chief Davalos about his leave dates.  Defendant Vigil

apparently did not do this.  This failure to interrogate Deputy Chief Davalos loses its significance,

however, when Defendant Vigil discovered that she was powerless to change Deputy Chief

Davalos' leave record in light of the Wage and Hour letter's prohibition against making those

kinds of changes.  Although Defendant Vigil did not receive the Wage and Hour letter until some

seven months after Deputy Chief Davalos disclosed to Defendant Vigil his use of compensatory

time for his kidney illness, Plaintiffs have not submitted any evidence that Defendant Vigil's failure

to interrogate Deputy Chief Davalos during the seven month period prior to Defendant Vigil's

receipt of the Wage and Hour letter was due to the fact that Deputy Chief Davalos is male and

not due to other innocent reasons such as a heavy work load or attention to more pressing

personnel matters.

Moreover, Plaintiffs assert that Defendant Vigil should have known that Deputy Chief

Davalos was undergoing treatment for kidney problems in 1999 and that he was using

compensatory time for leave related to that treatment.  The Plaintiffs have not presented evidence

that even if Defendant Vigil knew about Deputy Chief Davalos' 1999 kidney treatment,

Defendant Vigil had any reason to investigate Deputy Chief Davalos' leave record before he told

her in 2000 about his use of compensatory time.  After the 2000 meeting between Defendant

Vigil, Plaintiff Paez, Deputy Chief Davalos, and Mary Molina-Mescall, Defendant Vigil required

Deputy Chief Davalos to use sick leave for future FMLA leave.  In fact, Deputy Chief Davalos took quite a bit of sick leave in 2001 for FMLA purposes. A reasonable jury could not find that Defendant Vigil's actions with regard to Deputy Chief Davalos constitute evidence of disparate treatment and thus evidence of pretext.[25]

Interestingly, the Plaintiffs admit that after they raised the issue of use of compensatory time for FMLA qualifying absences, the Defendants upset male APD officers by retroactively changing the leave records of those male officers to reflect the use of sick leave for FMLA qualifying leave.  That kind of change to leave records is precisely what occurred to Plaintiffs and is actually evidence of fair, equal treatment, not disparate treatment.

d. Past Discrimination of Female Officers Taking Parental Leave

Plaintiffs present evidence that in 1997 eight female officers, as part of an agreement with the City, asked to have their parental leave reviewed to reflect use of compensatory time and/or vacation time instead of sick leave.  This request for review of parental leave to reflect the use of compensatory time and/or vacation time seems to contradict statements by Ms. Rodarte and Defendant Vigil that they interpreted Administrative Instruction No. 7-13, which was in effect in 1997, to disallow use of compensatory time for parental leave.  Although this inconsistency appears to suggest pregnancy/sex based discrimination by Defendant Vigil beginning at least as of

---

[25]The Court also finds that Deputy Chief Davalos' statement in his February 15, 2006 affidavit, Ex. 18,  that "APD personnel had previously customarily been allowed to use compensatory time for illness or any other time for which an officer could use sick leave" is not entitled to any weight because it is conclusory and without factual support.  *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995).

1997, and therefore evidence of pretext in this case,  Fed. R. Evid. 408(a)[26]  prohibits the Court

from considering evidence of the agreement between the City and those eight female officers.

Rule 408(a) states:

(a)  Prohibited uses.--Evidence of the following is not admissible on behalf of any party,
when offered to prove liability for, invalidity of, or amount of a claim that was disputed as
to validity or amount, or to impeach through a prior inconsistent statement or
contradiction:
(1)  furnishing or offering or promising to furnish--or accepting or offering or
promising to accept--a valuable consideration in compromising or attempting to
compromise the claim; and
(2)  conduct or statements made in compromise negotiations regarding the claim,
except when offered in a criminal case and the negotiations related to a claim by a
public office or agency in the exercise of regulatory, investigative or enforcement
authority.

Rule 408 applies to a prior settlement of claims if those claims "arose out of the same"

events as the claims now at issue and the previous claims "are similar enough to the claim sued

upon in this case to be relevant."  *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1363 (10th

Cir. 1987)("These factors, combined with the strong policy interest in encouraging the settlement

of disputes without resort to litigation, is sufficient to bring the evidence concerning the

[previous] compromises and settlements under the umbrella of Rule 408.").  Plaintiffs presented

evidence of a prior agreement or compromise involving parental leave for eight female officers

and the subsequent recalculation of retirement benefits based on re-characterizing the parental

---

[26]Rule 408 was amended effective December 1, 2006.  The Court uses its discretion under
28 U.S.C. § 2074(a) and United States Supreme Court Order, 2006 U.S. Order 20 (C.O. 20)
(April 12, 2006) to apply amended Rule 408 since the relevant portions of amended Rule 408 do
not represent a substantive change in the law and it is "just and practicable" to apply amended
Rule 408 to this pending lawsuit.  *See also* Advisory Committee Notes, 2006 Amendment ("The
amendment retains the language of the original rule that bars compromise evidence only when
offered as evidence of the 'validity,' 'invalidity,' or 'amount' of the disputed claim.  The intent is
to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is
offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim.").

leave to reflect use of compensatory time and/or vacation time; this prior agreement involved issues very similar to the ones in this case occurring in the same City department.  Hence, Rule 408(a) applies to evidence of that prior agreement.

The Plaintiffs offer evidence of the agreement between the City and eight female officers to show Defendant's Vigil's liability for pregnancy/sex based discrimination prior to February 1997 as well as to show her liability in this case for continuing to engage in pregnancy/sex based discrimination.  Under these circumstances, Rule 408(a) prohibits the admissibility of evidence of that agreement to prove Plaintiffs' claims of pregnancy/sex based discrimination.  Even if this conclusion "is doubtful, the better practice is to exclude evidence of compromises or compromise offers."  *Id*. at 1364.  Accordingly, evidence of the prior agreement between the City and eight female officers cannot be considered by Court.[27]

Plaintiffs also offer a statement by Det. Dow to show that Defendant Vigil wrongly treated other pregnant officers in the same way she treated the Plaintiffs.  Det. Dow states that in 1994 she was told to take FMLA leave for the birth of her child and that she had to take paid leave first, then unpaid leave for her parental leave.  Ex. 19 (attached to Exhibits "1" Through "24").  Det. Dow had wanted to combine paid leave with unpaid leave, but she does not specify in her statement how she wanted to combine the paid leave with unpaid leave.  Det. Dow's situation was unlike the Plaintiffs' situation because Det. Dow does not state that she was asking to use compensatory time, vacation, or part-time work for her parental leave.  Furthermore, Administrative Instruction No. 7-13, the policy in effect at the time Det. Dow had her child,

---

[27]The Court notes that Plaintiffs do not dispute that Rule 408 excludes evidence of that prior agreement.

would have required that Det. Dow take paid leave first before taking unpaid leave, which is exactly what occurred.  Hence, a reasonable juror could not find that Det. Dow's statement presents evidence of pretext.

Plaintiffs further argue that Ms. Saenz's lawsuit is evidence of pretext because Defendant Vigil played a key role in the pregnancy discrimination Ms. Saenz endured.  Ms. Saenz now states that "it was Ms. Vigil who forced me to take light duty because of my pregnancy, determined the nature of my light duty assignments, and refused to allow me to take intermittent leave even though I was entitled to do so under the APOA contract and even though male officers were permitted to do so, even when they were serving disciplinary suspensions. ...  Over the course of my eighteen-year employment with APD, I observed that Ms. Vigil took a special interest in pregnant officers and sought to punish them for being pregnant."  Affidavit of Marie A. Saenz at ¶¶5 and 6, Ex. 1 (attached to Reply in Support of Plaintiffs' Brief Presenting Additional Evidence of Pretext (Doc. No. 165), filed May 5, 2006).  These statements, however, do not carry any weight.  First, Defendant Vigil did not on her own initiative impose light duty on Ms. Saenz; the Claims Validation Unit made the decision to place Ms. Saenz on light duty.  Second, it is curious that Ms. Saenz did not raise the issue of being denied intermittent leave in her lawsuit but now makes that allegation without any specific supporting facts.  Third, Ms. Saenz's statement that Defendant Vigil punished pregnant police offices is simply conclusory, a personal opinion, and unsupported by factual allegations.  Finally, Ms. Saenz's lawsuit did not address the issues presented in this case, namely the issues of use of compensatory time and part-time work for parental leave by female officers.  Consequently, a reasonable juror could not find that Ms. Saenz's lawsuit is evidence of pretext by Defendant Vigil in her interactions with the Plaintiffs.

32

e.  Plaintiffs' Direct Evidence of Pretext

Plaintiffs assert that Defendant Vigil told them they had to take 12 weeks of FMLA leave because of their pregnancies; Defendant Vigil denies she said that to Plaintiffs.  However, this dispute about what was said is of no significance on the issue of pretext because of what actually happened.  The undisputed facts are that Plaintiff Orr took 13 weeks of parental leave and Plaintiff Paiz only took approximately 10 weeks of parental leave.  These undisputed facts show that Defendant Vigil did not actually require Plaintiffs to take 12 weeks of FMLA leave.  Consequently, a reasonable juror could not find that Plaintiffs' allegation that Defendant Vigil instructed Plaintiffs to take 12 weeks of FMLA leave is direct evidence of pretext when, in fact, Defendant Vigil did not limit Plaintiffs to 12 weeks of FMLA leave.

D.  Conclusion

Having reviewed the evidence as a whole, the Court concludes Plaintiffs have not demonstrated pretext "by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *See Jaramillo*, 427 F.3d at 1308.  In other words, Plaintiffs' allegations of pretext have not completely displaced Defendant Vigil and the City's "legitimate, non-discriminatory explanation, leaving no explanation for the decision."  *See id*. at 1309.  Because Plaintiffs did not carry their burden of showing pretext, summary judgment should be entered in Defendants' favor on Plaintiff Orr's Title VII and NMHRA claims with respect to her first pregnancy and Plaintiff Paiz's Title VII and NMHRA claims.

33

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. No. 39) is granted in that a separate final summary judgment will be entered dismissing with prejudice Plaintiff Orr's Title VII and NMHRA claims with respect to her first pregnancy and Plaintiff Paiz's Title VII and NMHRA claims.


_____
SENIOR UNITED STATES DISTRICT JUDGE